A98A0101. SALEM v. STATE OF GEORGIA.
(503 SE2d 62)

RUFFIN, Judge.

The State filed a forfeiture action against two parcels of real property, a checking account and a certificate of deposit ("CD") owned by Marva Salem. The State alleged that the real property was used to facilitate the possession of cocaine and marijuana and the distribution of marijuana and that the money in the checking account and the CD were proceeds derived or realized from the sale of cocaine and marijuana. Salem answered, asserting that she was an innocent owner of the forfeited property and was not holding the property for the benefit of any person whose conduct gave rise to the forfeiture action. The trial court forfeited all of the property at issue. Salem appeals, and for reasons which follow, we affirm.

As forfeiture actions are civil proceedings, the State was required to prove its case by a preponderance of the evidence. *Bettis v. State of Ga.*, 228 Ga. App. 120, 121 (491 SE2d 155) (1997). "Subsections (o) (5) and (p) (6) of OCGA § 16-13-49 provide that forfeiture proceedings shall be held by the court without a jury. Upon appellate review, factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The clearly erroneous test is the same as the any evidence rule." (Citations and punctuation omitted.) *Lyon v. State of Ga.*, 230 Ga. App. 264 (495 SE2d 899) (1998).

Given the above standards, the evidence shows that Salem and Willie Lawson have been friends since approximately 1965. Salem testified that at times Lawson would help her out of financial binds by co-signing loans with her or assisting her in making loan payments. She testified that in return she would take Lawson to the doctor due to his poor health.

On January 2, 1996, Lawson indicated to the branch manager of the First Citizens Bank in Reidsville, Georgia, that he wanted to set up a CD in Salem's name. Lawson's reasons for doing this were that Salem "had been a friend to him throughout the years, and she had stood by him even when his family did not, and he wanted to take care of her." Lawson mentioned to the branch manager that he had previously deposited some money in Lawson's daughter's name, but that she had spent it. The CD established in Salem's name was for $72,242.77. The CD amount originated from $20,000 that came from Lawson's business/checking account and $30,000 from a savings account he had set up in his daughter's name. This $50,000 was placed into a CD in 1990 and, with interest, grew into the $72,000 placed into Salem's CD in 1996. According to the branch manager, Lawson clearly understood that he was giving Salem the money and that he would no longer have any interest or control over it.

In addition, Lawson set up a checking account in Salem's name in January 1996. Lawson deposited $40,000 into Salem's new checking account. Finally, on January 12, 1996, Lawson quitclaimed to Salem four tracts of real property, including one tract on which Lawson's nightclub, the Twentieth Century Club, was located and an adjacent tract used as a parking lot for the club. On January 16, 1996, Salem executed a will in which she bequeathed to Lawson the CD, the $40,000 checking account and the real property she received from him.

The police had suspected for several years that drugs were being sold from Lawson's nightclub. One evening during March 1991, Officer F. J. Shuman of the Reidsville Police Department drove by Lawson's club and noticed Lawson standing outside the club in a wooded area. Officer Shuman saw Lawson making motions with his hand, and so he exited his car and walked over to the area where Lawson had been standing. He found on the ground a pill bottle that contained 2.5 grams that tested positive for cocaine. However, Lawson was not arrested. Then, on two occasions in 1992, a man named Lonnie Johnson assisted Officer Shuman in purchasing drugs at Lawson's club. Johnson said that on both occasions he purchased drugs from Lawson. The substance from each buy weighed less than one gram and tested positive for cocaine. However, Officer Shuman never witnessed Lawson selling cocaine, and Lawson was never charged with any crime. In fact, Officer Shuman testified that he

investigated Lawson for drug dealing for nine years and never arrested him.

At other times during the 1990s, other police officers investigated drug dealing from Lawson's club. Officer Michael Richardson of the Hinesville Police Department worked undercover with the Tri-Circuit Drug Task Force in 1993. On October 2, 1993, he pulled into the nightclub's parking lot and was approached by a man, Charles Smith, inquiring as to what Officer Richardson wanted. Officer Richardson said $20 in crack cocaine, and Smith told him to return in 30 minutes. Richardson saw Smith turn and walk towards the club. When Richardson returned, Smith was standing near the front of the club. He walked over and gave Richardson the cocaine. Then, on October 26, 1993, Richardson accompanied a confidential informant to the club. While Richardson waited in the car, the informant went into the club and returned with Smith. As the informant was purchasing the drugs, Lawson began yelling from the club at the informant and Smith to get Richardson out of there because Richardson was a police officer. However, Officer Richardson never saw Lawson selling drugs and admitted there was no probable cause to arrest Lawson.

A trooper from the Georgia State Patrol testified that he was involved in several more drug buys at Lawson's club in January 1994. According to the trooper, Lawson was directly involved in at least one of the transactions. The suspects named in these buys were Lawson, his club, Smith and a man named Willie A. Williams, Lawson's son. In each buy, less than a gram of cocaine was sold. There is no evidence of record that Lawson was arrested for any crime at this time.

In 1995, Officer Eddie Rewis of the City of Lyons Police Department spoke with Lawson, whom Rewis had known for 20 years. According to Rewis, during the conversation, Lawson admitted that in the past he had dealt in cocaine and marijuana and had become addicted to cocaine.

Five additional drug buys were made at the club in February 1996. Agent Tracy Sands with the Tri-Circuit Drug Task Force worked with a confidential informant in these buys. On February 9, 1996, the informant purchased less than a gram of cocaine from Williams, Lawson's son, near the club's bathroom. The next purchase was February 16, 1996. Again, the informant entered the club to purchase cocaine. The informant said he purchased drugs from Lawson's son while Lawson watched from the rear of the club. The substance from this buy also tested positive for cocaine.

On February 17, 1996, the informant went inside the club to purchase more drugs. The informant said that as he walked toward Williams, Lawson directed another man, Raymond Bradley Johnson,

to meet the informant. Johnson and the informant walked outside the club and down the street. Eventually, Johnson sold the informant outside the club less than a gram of cocaine.

Three other drug buys utilizing the informant occurred on the club premises on February 21, 23 and 28, 1996. In one transaction, the informant purchased less than a gram of cocaine from Williams. In another of the late February buys, the informant purchased 1.7 grams of a substance which tested positive for cocaine from a man named Nick Tattnall. In the last buy, the informant purchased from Johnson less than one gram of cocaine.

On March 1, 1996, the police, pursuant to a search warrant, searched Lawson's nightclub. The police arrested six people who possessed crack cocaine. The police seized nine baggies of marijuana in the bathroom of a private area in the back of the nightclub that Lawson used as a residence. The net weight of the marijuana was less than one ounce. Lawson stated that the marijuana was for his own personal use. However, he admitted he would "give the marijuana to females." The police also seized a bag containing white powder identified as lactose. State witnesses testified lactose was often used as a cutting agent for heroin and cocaine. Police seized another baggie which contained cocaine residue weighing less than a gram. The police also saw razor blades at the club, which an officer with the GBI testified were often used to process crack cocaine.

Police also seized documents concerning the forfeited money. Specifically, under a mattress in the residential area of Lawson's club the police seized the $72,000 CD which was listed in Salem's name and Salem's checkbook for her $40,000 checking account. In addition to finding the CD and the checkbook, the police found Salem's will in Lawson's residence in the back of the club. Although police seized other property, such as guns and cash, Salem has not claimed an interest in these items.

The State, in seeking to have the checking account, CD and real property forfeited, alleged that Salem was not an innocent owner of the property, but was merely holding it for Lawson's benefit.

In response to this allegation, Salem testified that there was no understanding that she was holding the real property or the money for Lawson or anyone else. Rather, she stated that she alone owned the checking account, the CD and the real property. Salem denied having any knowledge of any drug sales taking place at Lawson's club or in any drug transactions involving Lawson. Salem further testified that she kept her documents at Lawson's club because her husband had filed for divorce and she did not want him to learn of her new acquisitions.

1. We note that the State has failed to present evidence that the contraband involved in each transaction consisted of one gram or

more of cocaine or four ounces or more of marijuana. See *State of Ga. v. Foote*, 225 Ga. App. 222 (483 SE2d 628) (1997). Thus, the forfeiture must be based on the fact that the "property was used to facilitate a transaction in or a purchase of or sale of a controlled substance or marijuana." See OCGA § 16-13-49 (e) ("A property interest shall not be subject to forfeiture under this Code section for a violation involving one gram of cocaine or less or four ounces of marijuana or less unless said property was used to facilitate a transaction in or a purchase of or sale of a controlled substance or marijuana.").

We conclude that the State has sufficiently proven by a preponderance of the evidence that the real property at issue was used to facilitate the sale and purchase of cocaine and marijuana. Lawson admitted that in the past he had sold cocaine and marijuana; confidential informants had told police that they purchased cocaine from Lawson; and numerous drug transactions had taken place at the club over the years prior to March 1, 1996, when the search was executed. While the extent of Lawson's involvement in all of the transactions is not altogether clear, it is the property's involvement in the transactions that is vital to a determination of forfeiture. See *Carr v. State of Ga.*, 212 Ga. App. 36, 37 (1) (441 SE2d 85) (1994), overruled on other grounds, *Rabern v. State of Ga.*, 221 Ga. App. 874 (473 SE2d 547) (1996). "In a forfeiture action under OCGA § 16-13-49, the determination to be made by the finder of fact is not whether appellants possessed or used drugs, nor whether appellants were most likely engaged in selling drugs. The issue to be decided is whether the evidence presented by the state suffices to support a forfeiture under the relevant statute. [Cit.]" *Carr*, supra at 37 (1).

OCGA § 16-13-49 (d) further provides that "[t]he following are declared to be contraband and *no person* shall have a property right in them: (2) All property which is, directly or indirectly, used or intended for use in any manner to facilitate a violation of this article or any proceeds derived or realized therefrom." (Emphasis supplied.) As the real property was utilized to facilitate drug transactions, neither Lawson nor the owner of the property, Salem, could claim a property interest in it.

Moreover, for Salem to defeat the forfeiture of her property interest in the real property, she had to meet the requirement of OCGA § 16-13-49 (e) (4), which provides that the owner of the property must establish that she "[d]oes not hold the property for the benefit of or as nominee for any person whose conduct gave rise to [the] forfeiture. . . ." Salem had the burden to prove by a preponderance of the evidence that she was an innocent owner under the provisions of OCGA § 16-13-49 (e). *Maynard v. State of Ga.*, 217 Ga. App. 344, 345-346 (2) (457 SE2d 253) (1995).

Here, Salem did not take control of the property after Lawson

quitclaimed it to her. Rather, Lawson continued to operate his club from the property. Salem presented no evidence showing that she exercised any control over the land, and thus a factual question existed as to whether she was holding the property for Lawson's benefit. The trial court concluded that she was holding the property for Lawson, and we find that this conclusion was not clearly erroneous. *Lyon*, supra.

2. Concerning the CD and the checking account, we find no evidence, only mere speculation, that the money in the CD and checking account were used or intended for use to facilitate a drug transaction, or that the money was derived from drug transactions. See OCGA § 16-13-49 (d) (2). But OCGA § 16-13-49 (d) (6) also provides that no person shall have a property right in "moneys, negotiable instruments, securities, or other things of value which are found in close proximity to any controlled substance or marijuana or other property which is subject to forfeiture under this subsection." The CD and checkbook were "things of value" which were found in close proximity to the marijuana in Lawson's private residence. Thus, in accordance with OCGA § 16-13-49 (d), neither Lawson nor Salem could claim any interest in them.

Moreover, for Salem's property interest in the CD and checking account not to be subject to forfeiture, she had to prove that she "[d]oes not hold the property for the benefit of or as nominee for any person whose conduct gave rise to [the] forfeiture, and, if [she] acquired the interest through any such person, [she] acquired it as a *bona fide purchaser for value* without knowingly taking part in an illegal transaction. . . ." (Emphasis supplied.) OCGA § 16-13-49 (e) (4).

While Salem testified that she did not hold the property in trust for Lawson, it is clear that she was not a bona fide purchaser for value; the CD and checking account were Lawson's gifts to her. Accordingly, Salem failed to meet all the requirements of OCGA § 16-13-49 (e) such that her property interest would not be subject to forfeiture. See *Maynard*, supra (there was no bona fide purchaser for value of real property sought to be forfeited as brother deeded the property to his sister as a gift).

Accordingly, we find that the trial court did not clearly err in forfeiting the real property, the CD and the checking account in this case. *Lyon*, supra.

*Judgment affirmed. Pope, P. J., and Beasley, J., concur.*

DECIDED JUNE 5, 1998 —
RECONSIDERATION DENIED JUNE 17, 1998 —

*Salter & Shook, Mitchell M. Shook, Jason A. Craig*, for appellant.

*Dupont K. Cheney, District Attorney, Carole E. Wall, Assistant District Attorney, Kimberly A. Staten-Hayes*, for appellee.